**EXHIBIT 1**

### MEMBER AGREEMENT

This Member Agreement (this "Agreement") to be effective as of the Closing Date (as defined in the JV Agreement, as defined below)) (the "Effective Date"), is entered by and among Inland Trailer, S. de R.L. de C.V. (the "Company"), Inland Trailer Holdings, LLC ("Holdings") and TMI Trailer Mechanic International, S.A. de C.V. ("TMI"). Holdings and TMI will be individually referred to as a "Member" and collectively as the "Members".

### RECITALS

A.  The Company is a limited liability company of variable capital (*sociedad de responsabilidad limitada de capital variable*) duly formed and in existence under the laws of Mexico. The articles of formation of the Company are contained in the public instrument number 2,870 dated May 17, 2016, granted before Mr. Victor Manuel Martinez Morales, Notary Public No. 108 of San Pedro Garza García, Nuevo Leon, Mexico, and which first testimony was recorded before the Public Registry of Property and Commerce of Monterrey, Nuevo Leon, Mexico under the electronic file No. 160706*1. The current bylaws of the Company (the "Bylaws") are contained in the public instrument number 6,528, dated November 8, 2021, granted before Perla Iris Villareal Cantú, substitute notary at the Notary Public No. 108 of San Pedro Garza García, Nuevo Leon, Mexico, and which first testimony is in process to be recorded before the Public Registry of Property and Commerce of Monterrey, Nuevo Leon, Mexico.

B.  The Members own all of the Company's issued and outstanding membership units (capital equity).

C.  The respective equity holdings of the Members as of the date hereof are as follows:

| Member | Member-ship Units | Value (Pesos) | Votes | Equity Percent |
|---|---|---|---|---|
| Inland Trailer Holdings, LLC | 1 | 1,530 | 1,530 | 51% |
| TMI Trailer Mechanic International, S.A. de C.V. | 1 | 1,470 | 1,470 | 49% |
| Total: | 2 | 3,000 | 3,000 | 100% |

D.  TMI is in the business of manufacturing, assembling, repairing, and selling different types of industrial trailers and semitrailers (hereinafter, the "Trailers") and other related products and services (the "Business"). TMI has its principal manufacturing, warehousing and distribution facilities at Privada del Marques 2, Parque Industrial El Marques, El Colorado, El Marques, Querétaro, Zip Code 76246, with a total area of 18,288 square meters (hereinafter, the "Facilities"). The land where the Facilities are located is owned by TMI's shareholders (the "Shareholders").

E.  Holdings and TMI have agreed to enter into a joint venture (hereinafter, the "Joint Venture") to partner in the Business, with the purpose, among others, of increasing the capacity of the Business. For such purposes, the parties have agreed that commencing on the Effective Date the Company will operate the Business and that all the assets, properties and rights currently used in, owned by, or related to the Business (hereinafter, the "Assets") be transferred and contributed to the Company, regardless of whether the Assets are within the Facilities or elsewhere and whether owned by TMI or third parties, except for the Excluded Assets (as defined below). For its part, Holdings has agreed to make certain capital contributions in cash to the Company and to grant a revolving credit line in the total principal amount of U.S.$2,500,000 (two million five hundred thousand dollars, legal currency of the United States of

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

America) to finance the Company's operations and/or the operations of Inland Trailer Land, S. de R.L. de C.V. (the "Loan").

F.   Holdings and TMI have signed a joint venture agreement dated November 5, 2021 (hereinafter, the "JV Agreement") that contains the general terms and conditions of the Joint Venture, the obligations assumed by each Member and their Affiliates (as defined below), as applicable, and the list of documents that will be signed in connection with the Joint Venture.  This Agreement is part of the documents required by the JV Agreement.

G.   The Members and the Company want to make certain agreements among them to set forth the rules for certain matters relating to the control and business affairs of the Company, including, without limitation, to determine the terms and conditions under which the Members will make the contributions referenced in Recital E., to provide for the governance and management of the Company, and to provide certain conditions related to the transfer of membership units issued by the Company and rights of first refusal to purchase new membership units issued by the Company.

NOW, THEREFORE, in consideration of the foregoing Recitals, which are expressly incorporated herein by reference, the following terms, covenants, and conditions, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## AGREEMENTS

## ARTICLE 1
## SCOPE OF AGREEMENTS

1.1)   Members' Control Agreement.  This Agreement will constitute a members' agreement entered into pursuant to articles seventh and twenty-fourth of the Company's Bylaws.  This Agreement is intended to supplement and further elaborate on certain provisions under the Bylaws of the Company.  In the event of any conflicts between the provisions in the Company's Bylaws or other corporate documents and the provisions in this Agreement, the provisions of this Agreement will prevail.  The parties' intention is to give full application to the provisions in this Agreement and, therefore, in case that Mexico's *Ley General de Sociedades Mercantiles* (the "LGSM") or any other applicable laws contain provisions that are contrary to the provisions in this Agreement, the parties expressly waive the provisions in such laws that are contrary to the provisions in this Agreement and the provisions in this Agreement will apply to the fullest extent permitted by law, unless the law prohibits such application or such prohibition cannot be waived.

1.2)   Membership Units Subject to this Agreement.  This Agreement shall apply to all membership units of the Company now owned or hereafter acquired by or on behalf of the Members or any permitted successors, assignees or transferees, whether by purchase, dividends on membership units, split of membership units or other recapitalization, gift, or any other means whatsoever (all and each of them, the "Membership Units").

1.3)   Parties Subject to Agreement.  This Agreement shall be binding upon and inure to the benefit of each Member, the permitted successors, assignees and transferees of Membership Units who become the record owners thereof on the books of the Company, and the Company and their respective legal representatives, permitted successors, assignees and transferees, as the case may be.  As a condition to any transfer of Membership Units, the corresponding permitted successor, assignees or transferee must agree in writing to become a party to this Agreement.

73525752 v13

1.4)    Voting of Membership Units. Membership Units shall be voted so as to carry out the terms and intent of this Agreement. All Membership Units owned by a Member shall be voted by such Member or such Member's duly authorized attorney-in-fact or proxy.

## ARTICLE 2
## CAPITAL CONTRIBUTIONS

2.1)    Fixed Capital. The Company has and will maintain a fixed corporate capital of MXN$3,000 (three thousand pesos, legal currency in Mexico). Holdings owns one (1) membership unit of the Company representative of the Company's fixed corporate capital with par value of MXN$1,530 (one thousand five hundred thirty pesos, legal currency in Mexico). TMI owns one (1) membership unit of the Company representative of the Company's fixed corporate capital with par value of MXN$1,470 (one thousand four hundred seventy pesos, legal currency in Mexico).

2.2)    Variable Capital; Initial Contributions. The Company's variable corporate capital will be unlimited. The Members agree to make the initial contributions stated in this Section 2.2) (the "Initial Contributions"), pursuant to the terms and conditions set forth in this Agreement:

(a)     *TMI's Initial Contributions.* On the Effective Date TMI will assign, transfer, convey and contribute (and, to the extent that any third party owns or holds any rights on any of the Assets, TMI will cause the owners or holders of rights to assign, transfer, convey and deliver) to the Company all rights and title to all the Assets. The Assets will include, without limitation, the infrastructure described in Exhibit A; the machinery and equipment listed in Exhibit B; the raw materials, inventory (including inventory with accounts payable, which will be assumed by the Company, but excluding final products pending to be paid that TMI has invoiced to its customers as of the Effective Date) and work in process described in Exhibit C; all intellectual property and proprietary rights in any jurisdiction used in or in connection with the Business, including: patents, patent applications, inventions, revisions or improvements, trade secrets, technical data, technology, know-how, methods and processes, unregistered and registered copyrights and copyrightable works, and any similar or equivalent rights to any of the foregoing, to the extent assignable, including but not limited to, the rights listed in Exhibit D; all permits, approvals, registrations, licenses, certifications, or other authorizations of any governmental entity or other third-parties related to the Business, to the extent assignable, including those listed in Exhibit E; all the agreements and commitments in effect as of the Effective Date related to the Business listed in Exhibit F (the "Assigned Contracts"); and the miscellaneous assets listed in Exhibit G. Notwithstanding the above, the Assets will not include the assets, properties and rights related to space-it and aftermarket products and services owned or otherwise controlled by TMI, whether used in connection with the Business or not, and whether located at the Facilities or elsewhere, which are listed in Exhibit H, and the other assets also listed in Exhibit H (jointly, the "Excluded Assets"). For avoidance of doubt, the parties acknowledge and agree that the term "Assets" (i) includes all and any assets, properties or rights owned by or under the control of TMI or that are otherwise used in or in connection with or that are related to the Business, whether located at the Facilities or elsewhere but (ii) excludes the Excluded Assets, whether located at the Facilities or elsewhere. These transfers will include all and any rights to the Assets and the Assets will be assigned, transferred, conveyed and contributed to the Company free of all and any mortgages, liens, pledges, security interests, charges, claims, restrictions, limitation or encumbrances of any nature whatsoever ("Encumbrances"). TMI (and to the extent applicable, all other owners of or holders of any rights on any part of the Assets) will retain all the liabilities and obligations arising out of or related to the Assets or the operation of the Business up to the end of the day before the Effective Date. TMI will issue, execute and deliver (and will cause all other owners or holders of any rights on any part of the Assets to issue, execute and deliver) to the Company all titles, invoices and all other documents reasonably requested by the Company or required by applicable law to transfer to the Company all interests in or to the Assets. As a result of the foregoing transactions, it will be considered that TMI will

73525752 v13

Imported, Signed and Shared by OP.Sign
Last update: 17 Nov 2021, by Rodrigo Soto

contribute, convey, assign, transfer and deliver, and the Company will acquire and receive, all rights, title and interest in and to all the Assets free and clear of any Encumbrances. The parties agree that all the Exhibits and Schedules contemplated in this Agreement will be completed and attached on the Effective Date.

The parties agree that for purposes of determining and computing the amount of TMI's contribution, the total value of the Assets will be assessed at U.S.$458,294.12 (four hundred fifty eight thousand two hundred ninety four 12/100 dollars of the United States of America). For purposes of determining and computing the amount of TMI's contribution, this amount will be calculated in Mexican pesos according to the official exchange rate to pay obligations in U.S. dollars published by Mexico's central bank the business day prior to the Closing Date. Therefore, in exchange for the contribution of the Assets, on the Closing Date the Company will issue to TMI equity in the Company's variable corporate capital in the amount in Mexican pesos resulting from such conversion.

(b)     *Holdings' Initial Contributions*. On the Effective Date Holdings will contribute and pay to the Company, in cash, U.S.$477,000.00 (four hundred seventy seven thousand 00/100 dollars of the United States of America). For purposes of determining and computing the amount of Holdings' contribution, this amount will be calculated in Mexican pesos according to the official exchange rate to pay obligations in U.S. dollars published by Mexico's central bank the business day prior to the Closing Date. Therefore, in exchange for this cash contribution, on the Closing Date the Company will issue to Holdings equity in the Company's variable corporate capital in the amount in Mexican pesos resulting from such conversion.

2.3)     Documenting Initial Contributions. On the Effective Date the Members will (i) execute written resolutions in lieu of a meeting to approve an increase on the Company's variable corporate capital equal to the total amount of the Members' Initial Contributions under Section 2.2) and the subscription of the capital increase in the form described in Section 2.2); and (ii) record the capital increase and the subscription thereof in the Company's corporate record books. In addition, the parties agree to execute and deliver all and any other documents that may be required to approve, document or implement the capital increase or the subscription or payment thereof.

2.4)     TMI's Representations, Warranties and Covenants Regarding the Assets. TMI represents, warrants and/or covenants to Holdings and to the Company that as of the Effective Date:

(a)     *Title to Assets*. Title to the Assets will be conveyed, transferred, assigned and contributed to the Company free and clear of any Encumbrances, due taxes or any other debts. As of the Effective Date there are no liabilities, obligations or indebtedness that may affect any of the Assets or the Business after the Effective Date, except for the indebtedness and liabilities listed in Schedule 2.4(a) and such other liabilities, obligations or indebtedness that do not result in a Material Adverse Effect (as defined below). The Assets in the aggregate have been maintained in accordance with normal industry practice, are in the aggregate in reasonable operating condition and repair (subject to normal wear and tear) and adequate and suitable for the purposes for which the Assets are presently used. The Assets (along with the real estate where the Facilities are located) (i) constitute all of the assets, property, and rights that are used in or necessary for the operation of the Business as it is operated on the Effective Date and (ii) are reasonable sufficient for the continued conduct of the Business after the Effective Date in substantially the same manner as conducted by TMI prior to the Effective Date. The Company will be responsible for any value added taxes, fees, costs and expenses in connection with or related to the transfer of the Assets to the Company, including any notary public fees TMI will be responsible for any income taxes and any other charges that are the seller's or the transferor's responsibility according to applicable law.

(b)     *Authority; Non-Contravention*. TMI has the requisite power to execute and deliver this Agreement and to assign, transfer, convey and contribute (and, to the extent that any third party owns or

73525752 v13

**Imported, Signed and Shared by** OP.Sign
Last update: 17 Nov 2021, by Rodrigo Soto

holds any rights on any of the Assets, to cause such parties to assign, transfer, convey and deliver) to the Company all rights and title to all the Assets and to fulfill all its obligations hereunder. Upon due execution by all the parties hereto, this Agreement will constitute the valid and binding obligations of TMI. Neither the execution and delivery of this Agreement nor the assignment, transfer, conveyance or delivery of the Assets to the Company will conflict with or result in any violation of any provision of any agreements or other instruments TMI or any party that owns or holds any rights on any of the Assets are parties to, except for such violations which do not result in a Material Adverse Effect (as defined below). Except for any authorizations previously obtained, TMI does not require any additional approval, permission, consent, ratification, waiver or other authorization from any governmental entity or any other entity or individual to execute and deliver this Agreement.

(c)     *Assigned Contracts.*  Except as expressly identified in Exhibit G: (i) there are no agreements or commitments affecting or related to the Business that individually and in a stand-alone basis would represent an annual obligation to the Business in excess of U.S.$10,000 (ten thousand dollars of the United States of America) (the Assigned Agreements above such threshold, the "Material Contracts"); (ii) there are no defaults related to any Material Contracts by TMI or to the knowledge of TMI by any other party to the Material Contracts and, to the knowledge of TMI, no event has occurred (or failed to occur) that, with the passing of time or the giving of notice or both, would constitute a default under any Material Contracts, except for such defaults that do not result in a Material Adverse Effect; (iii) to the knowledge of TMI each Material Contract is in full force and effect; and (iv) TMI has provided or made available to Holdings a true and correct copy of all the Material Contracts, together with all amendments, assignments, transfers or other changes thereto.

(d)     *No Liabilities.*  Except for the obligations under the Assigned Contracts and the obligations transferred to the Company in accordance with the JV Agreement and any agreements and documents executed thereunder, there are no liabilities or obligations relating to the Business or the Assets that will be transferred to the Company or that may affect any of the Assets or the Business, except for such obligations or liabilities that do not result in a Material Adverse Effect.

(e)     *Tax and Customs Matters.*  TMI has timely filed all tax returns that it was required to file in the last five (5) years. All such tax returns were correct and complete in all material respects and were prepared in compliance with all applicable laws. All taxes owed by TMI related to the Assets or the Business prior to the Effective Date (whether or not shown or required to be shown on any tax return) have been paid (or for taxes that are not yet due, will be paid by TMI when due). To its knowledge, there is no dispute or claim concerning any tax liability of TMI which may result in a Material Adverse Effect. All duties, taxes or charges generated by the importation or exportation of any of the Assets have been timely paid (or those not yet due will be paid by TMI when due). TMI has all the necessary customs documentations and is otherwise in compliance with all applicable customs laws and all other applicable laws regarding the importation or exportation of the Assets, except for such compliance obligations which default does not result in a Material Adverse Effect.

(f)     *Labor Relations.*  There is no collective bargaining agreement covering any employee working at the Business and to its knowledge there are no current or threatened attempts to organize or establish any labor union or employee association to represent any employees. All obligations regarding employee benefits for all the employees working at the Business have been satisfied, and there are no outstanding breaches, defaults or violations to any employee payments or benefits plan which default, breach or violation would result in a Material Adverse Effect. "Employee benefits" include all benefits granted to the employees working at the Business or that are otherwise required by the laws of Mexico, including, without limitation, profit sharing, minimum vacations, minimum days of rest, vacation premium, Christmas bonus, severance rights, seniority premiums, and registrations with Mexico's Institute of Social Security, Mexico's Housing Fund, and Mexico's Retirement Fund. All payments, contributions or

73525752 v13

**5/32**

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

premiums required to be paid, collected or remitted as of the Effective Date for all and each employee benefits have been or will be collected and remitted or paid in a timely fashion and there are no pending payments or liabilities with respect to any employee benefits. All wages or any other amounts earned by the employees working at the Business prior to the Effective Date have been or will be duly and timely paid. Any and all payments and employee benefits for those employees working at the Business immediately prior to the Effective Date and that will continue working at the Business after the Effective Date will be current at the time the employees are transferred to the Company or will be duly and timely paid. TMI acknowledges and agrees that the employees working at the Business will be transferred with their seniority to the Company via an "employer substitution" pursuant to Article 41 of Mexico's Federal Labor Law and the terms of certain employer substitution agreement to be entered between TMI and the Company (the "Employer Substitution Agreement"). Consequently, at the time the employees working at the Business are transferred to the Company, the Company will assume all the obligations vis-à-vis those employees; the Company will recognize and accept the seniority accumulated by each employee for the time of service with TMI and the benefits accumulated by the employees because of such seniority.

(g)     *Environmental Matters*. The Facilities and the Assets are, and for the last five (5) years have been conducted, in compliance with all applicable laws and regulations concerning public or worker health and safety, pollution or protection of the environment ("Environmental Laws") and they have been and are in compliance with all applicable permits, approvals, registrations, licenses, certifications, or other authorizations of any governmental authority or other third-parties ("Permits") required pursuant to applicable Environmental Laws for the operation of the Business, except for such compliance obligations which default would not result in a Material Adverse Effect. TMI has not received in the past five (5) years any notice from a governmental entity alleging that it is not in compliance with applicable Environmental Laws regarding the Business or the Facilities. To its knowledge, there has been no release of any substances defined as "hazardous substances," "hazardous materials," "hazardous wastes," "oil," "petroleum," "pesticides," "toxic chemicals," "contaminants" or "pollutants" or other similar designations in any applicable Environmental Laws ("Hazardous Substances") on, in, at, from, under or around the Facilities in violation of any applicable Environmental Laws, and to its knowledge none of the Facilities or any Assets has been contaminated by any Hazardous Substance in violation of any applicable Environmental Laws, except for such violations which do not result in Material Adverse Effect.

(h)     *Compliance with the Law*. The Business is, and all the operations at the Business are and have been conducted, in compliance with all applicable laws, except for such compliance obligations which default does not result in a Material Adverse Effect.

(i)     *Litigation*. To its knowledge, there is no suit, claim, action, proceeding or investigation pending or, to its knowledge, threatened against TMI or that is otherwise related to or that may materially and adversely affect any of the Assets or the Business. To its knowledge, there are no pending or unsatisfied judgments or orders against TMI or that may otherwise materially and adversely affect any of the Assets or the Business.

2.5)     Holdings' Representations, Warranties and Covenants.  Holdings represents, warrants and/or covenants to TMI and to the Company that as of the Effective Date:

(a)     *Cash; Legal and Legitimate Sources*. That all the cash capital contributions from Holdings and the proceeds from the Loan come from legal and legitimate sources, in compliance with all applicable anti-money laundering and anti-terrorisms financing laws. As of the Effective Date there are no liabilities, obligations or indebtedness that may affect the cash to be contributed by Holdings and the Loan to be granted or caused to be granted by Holdings. The Company will be responsible for any value added taxes, fees, costs and expenses in connection with or related to cash capital contributions from Holdings. Holdings will be responsible for any income taxes and any other charges that are a contributor's

**6/32**

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

responsibility according to applicable law.

(b)     *Authority; Non-Contravention*. Holdings has the requisite power to execute and deliver this Agreement and to fulfill all its obligations hereunder. Upon due execution by all the parties hereto, this Agreement will constitute the valid and binding obligations of Holdings. Neither the execution and delivery of this Agreement nor the performance of its obligations under this Agreement will conflict with or result in any violation of any provision of any agreements or other instruments Holdings is a party to. Holdings does not require any approval, permission, consent, ratification, waiver or other authorization from any governmental entity or any other entity or individual to execute and deliver this Agreement.

(c)     *Tax Matters*. Holdings has timely filed all tax returns that it was required to file in the last five (5) years. All such tax returns were correct and complete in all material respects and were prepared in compliance with all applicable laws. To its knowledge, there is no current dispute or claim concerning any tax liability of Holdings, except for such compliance obligations which default does not result in a Material Adverse Effect.

(d)     *Litigation*. To its knowledge, there is no suit, claim, action, proceeding or investigation pending or, to its knowledge, threatened against Holdings or that is otherwise related to or that may materially and adversely affect any of the cash capital contributions to be granted by Holdings or the Loan. To its knowledge, there are no pending or unsatisfied judgments or orders against Holdings or that may otherwise materially and adversely affect any of the cash capital contributions to be granted by Holdings or the Loan.

2.6)   Company's Representations, Warranties and Covenants.   The Company represents, warrants and/or covenants to TMI and to Holdings that as of the Effective Date:

(a)     *Authority; Non-Contravention*. The Company has the requisite power to execute and deliver this Agreement and to fulfill all its obligations hereunder. Upon due execution by all the parties hereto, this Agreement will constitute the valid and binding obligations of the Company. Neither the execution and delivery of this Agreement nor the performance of its obligations under this Agreement will conflict with or result in any violation of any provision of any agreements or other instruments the Company is a party to. Except for any authorizations previously obtained, the Company does not require any additional approval, permission, consent, ratification, waiver or other authorization from any governmental entity or any other entity or individual to execute and deliver this Agreement.

(b)     *Tax Matters*. The Company has timely filed all tax returns that it was required to file since its formation. All such tax returns were correct and complete in all material respects and were prepared in compliance with all applicable laws. There is no current dispute or claim concerning any tax liability of the Company.

(c)     *Labor Matters*. Any and all applicable payments and employee benefits for those employees working for the Company on the Effective Date will be current as of the Effective Date. The Company acknowledges and agrees that the employees working for TMI in the Business on the Effective Date will be transferred with their seniority to the Company via an "employer substitution" pursuant to Article 41 of Mexico's Federal Labor Law and the terms of the Employer Substitution Agreement. Consequently, at the time the employees working for TMI at the Business are transferred to the Company, the Company will assume all the obligations and liabilities vis-à-vis those employees.

2.7)   Additional Unscheduled Contributions.   The parties anticipate that any other amounts needed for the operations of the Company beyond the contributions described in Section 2.2) will be obtained through proceeds from the Loan and from sales and cash flows generated by the Company. However, the

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

provisions in Sections 2.7) and 5.2) will apply in the event that the Board determines that additional funding is necessary.

At least sixty (60) calendar days prior to the end of each calendar year the Board will prepare and approve a budget estimating the working capital requirements of the Company for the following year (each, the "Budget Year"), including but not limited to, operating expenses, development expenses, taxes, insurance, debt service for all debts and other liabilities or obligations of the Company, exclusive of any allowance for depreciation (each, an "Annual Plan"), provided, however, that the first Annual Plan will be attached as Exhibit I. If the Board determines that: (a) funds of the Company on deposit or on a firm commitment for the Budget Year, including the First Budget Year; (b) the projected revenues of the Company for the Budget Year, including the First Budget Year; plus (c) funds available to the Company through the Loan and other financing established, are insufficient to satisfy the working capital requirements of the Company to comply with the corresponding Annual Plan, the Board will (i) revise the applicable Annual Plan and determine the additional funding that the Board deems necessary to fund the deficit and (ii) communicate to the Members the amount of the additional funding required.

All additional borrowing must be approved by all the members of the Board in writing and such approval will contain the terms and conditions under which the additional borrowing will be obtained. If the Company is unable to secure the additional funding required from third parties under terms and conditions commercially reasonable or deemed acceptable by all the members of the Board, then all members of the Board may require the Members to provide the additional funding needed. Unless otherwise agreed by the Members in writing, all such additional funding will be provided in the form of loans to the Company (each, an "Additional Loan"). The Board, acting unanimously, will specify the terms and conditions for each Additional Loan.

Notwithstanding the foregoing, the parties acknowledge that, in addition to the Loan, Holdings has stated that it may (but will have no obligation to) offer one or more additional loans for up to a combined amount of U.S.$9,500,000 (nine million five hundred thousand dollars of the United States of America) (the "Holdings Additional Loans") under terms and conditions similar to those applicable to the Loan, including similar interest rates and similar (but incremental) collateral. If the Board determines that additional funding is necessary pursuant to this Section 2.7, the Board may request that Holdings provides such funding through the Holdings Additional Loans up to the combined amount set forth in this paragraph by sending written notice to Holdings of the requested loan. Holding will have ten (10) business days from the date Holding receives such notice to provide a written answer whether Holding will provide the requested Holdings Additional Loan; in the event Holdings fails to provide an answer within such term, Holdings will be deemed to have declined to provide the requested loan.

2.8)    Same Equity Percentages.  Except as otherwise agreed in writing by the Members, each Member will maintain the same ownership percentage of the membership units issued by the Company at all times (i.e. Holdings will own fifty-one percent (51%) and TMI will own forty-nine percent (49%)).

### ARTICLE 3
### GOVERNANCE/MANAGEMENT

3.1)    Board.  The Company will be managed by a three (3) member board of managers (the "Board"). Holdings will appoint two (2) members to the Board and TMI will appoint one (1) member. Each manager shall serve for an indefinite term until (i) his/her resignation and his/her replacement is appointed by the Member that appointed him/her or (ii) his/her appointment is revoked by the Member that appointed him/her and his/her replacement is appointed by the Member that appointed him/her.

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

3.2)   Matters Reserved to the Members.  Except as expressly agreed to the contrary or modified in this Agreement (and only to the extent that such agreement to the contrary or modification is valid under applicable law), (a) the matters listed under Article 78 of the LGSM will be reserved to the Members and (b) the Board will have no authority on such matters.  Furthermore, the parties agree that the following decisions will require the unanimous approval of all the Members:

(a)   Any increases or reductions of the Company's corporate capital, including by recapitalization, issue of additional Membership Units or other equity interests in the Company, increase or reduction of the Membership Units value, or redemption of Membership Units or other equity interests in the Company.

(b)   Any amendments to the Company's bylaws.

(c)   To approve the Company's dissolution, liquidation, conversion, merger, spin-off or consolidation into or with another entity.

(d)   The Transfer (as defined below) of any Membership Units before the expiration of the Non-Transfer Period (as defined below), except that (i) Holdings may Transfer its Membership Units to any entity that is controlled, directly or indirectly, by Matthew T. Moroun, Lindsey, S. Moroun, Agnes N. Moroun or any of their lineal descendants; and (ii) TMI may Transfer its Membership Units to any entity that is controlled, directly or indirectly, by Alfonso Soto Septién, Rodrigo Soto Pesquera, Monica Rosario Franco Hernandez or any of their lineal descendants.

(e)   The authorization to guarantee any debt, responsibility or obligation contracted by any third party.

Except for the matters set forth above, the rest of the decisions reserved to the Members will be made by the vote of Members holding at least 51% of the Company's corporate capital.

3.3)   General Authority of the Board.  Except as expressly set forth in this Agreement, the Board will manage all the affairs of the Company.  The Board will have the authority to resolve all matters except for those reserved to the Members pursuant to Section 3.2) of this Agreement.  The following decisions will require the unanimous approval of all members of the Board:

(a)   Any decisions for the Company to borrow money (and the terms and conditions applicable to such borrowing) above and beyond the Loan, including to assume any indebtedness or guaranty or to endorse or otherwise become liable for any debt obligations, provided, however, that such approval will not be required for payment or credit obligations incurred in the Company's ordinary course of business for an amount equal or less than thirty thousand dollars of the United States of America (US$30,000) in the aggregate during any fiscal year, pursuant to Section 3.6 below.

(b)   To appoint and/or remove the president, unless the removal is due to the president failing to materially perform his duties, in which case the majority of the members of the Board may appoint the replacement of such president.

(c)   To approve the Company to create, incur, assume, or cause to exist any Encumbrance on any of the Company's assets now owned or hereafter acquired, pursuant to Section 3.8 below, except for Encumbrances granted in connection with the Loan.

(d)   To approve the Company to sell, lease, encumber or otherwise dispose of any property, assets, rights or business of the Company, except in the ordinary course of business and consistent with the

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

applicable Annual Plan, pursuant to Section 3.9 below, except for Encumbrances granted in connection with the Loan.

Except for the decisions listed above, all other decisions may be taken by a majority of the members of the Board. The Board's consent or decisions may be included in the Annual Plan, as long as such consent or decision has the required votes for approval.

3.4)  Daily Operations; Officers. The officers appointed or hired by the Board will carry out the day-to-day operations of the Company, subject to the direction and supervision of the Board. Subject to the provisions in this Agreement, the Board will determine the authority and responsibilities of each officer at the time of his/her appointment.

The officers of the Company shall: (i) conduct the business of the Company strictly in accordance with the budgets, business plans (including the applicable Annual Plan) and instructions provided by the Board; (ii) maintain the existence, licenses and rights of the Company; and (iii) pay all obligations, liabilities, and taxes of the Company as they become due (except to the extent any such obligation or liability is contested in good faith with adequate reserves provided).

In addition to any other appointments the Board may deem appropriate, the Board will make the following appointments:

(a)  *President.* Rodrigo Soto Pesquera ("Rodrigo") will be appointed as president of the Company and in such capacity will oversee the daily operations of the Company. Rodrigo will be the president of the Company but not the president/chairperson of the Board; the Members will designate the president/chairperson of the Board periodically at the time Board members are appointed and, if the Members fail to make such appointment, the Board will appoint its president/chairperson. Rodrigo will be retained pursuant to an agreement in the form attached as Exhibit J (the "Engagement Agreement"). Rodrigo will follow in good faith the Board's directions and guidelines, including the applicable Annual Plan, at all times. Rodrigo will use commercially reasonable efforts in the performance of his duties to meet all of the Company's goals and commitments and the Board's directions and guidelines. Rodrigo will be responsible for ensuring that all other officers of the Company comply with their duties. Rodrigo will have the authority to hire and discharge any professionals and employees that he deems appropriate to assist him in managing the Company's affairs and daily operations but Rodrigo (i) must take these actions following the Board's directions and the Annual Plan and (ii) may not remove anyone appointed or retained by the Board without the Board's prior written consent. Rodrigo will have the authority to enter into any contract, lease, or other arrangement for the acquisition or lease of equipment or property or that otherwise creates obligations for the Company of no more than thirty thousand dollars of the United States of America (US$30,000) (or its equivalent in pesos, legal currency in Mexico) in the aggregate during any fiscal year, pursuant to Sections 3.6 and 3.7 below; if any of those transactions exceeds the dollar amount referenced, only the Board will have the authority to authorize such transaction. Rodrigo will provide monthly detailed reports regarding the Company's operations, including any challenges the Company may face to meet any aspect of the applicable Annual Plan. The Board will use these reports as part of the considerations to prepare or modify the Annual Plan(s). The Board may remove Rodrigo as president of the Company at any time but only if Rodrigo fails to materially perform his duties.

(b)  *Treasurer.* Within three to six months from the Effective Date, the Board, following the recommendations of the managers appointed by Holdings, will appoint a treasurer of the Company. The treasurer will be responsible for managing the financial affairs of the Company, including, without limitation, managing all the cash of the Company and opening and managing bank accounts, whether in Mexico, the United States or elsewhere the treasurer deems appropriate. The treasurer will have the

73525752 v13

**Imported, Signed and Shared by** OP.Sign
Last update: 17 Nov 2021, by Rodrigo Soto

authority to hire, subject to the president's and the Board's approval, any professionals that the treasurer deems appropriate to assist the treasurer in managing the Company's financial affairs but the treasurer must take these actions following the Board's directions and the Annual Plan. The treasurer and the professionals retained by the treasurer will be compensated by the Company according to market conditions. The treasurer will follow strictly the president's and the Board's directions and guidelines, including the applicable Annual Plan. In the event of any discrepancies between the approvals, directions or guidelines provided by the president and the Board, those provided by the Board will prevail. The treasurer will provide any assistance requested by Rodrigo to prepare the monthly detailed reports regarding the Company's operations. The Board may remove the treasurer at any time but the appointment of any new treasurer will follow the recommendations of the managers appointed by Holdings.

3.5)   Information. The Company's officers will actively provide to the Board all and any information concerning the financial condition, business, assets, liabilities, revenues, expenses, and affairs of the Company, including, without limitation, the Company's bank statements, contracts, balance sheet, operating statement, and changes in financial position, together with related footnotes and schedules, if any, for each of the Company's fiscal months and years, all prepared consistent with the Company's regular accounting procedures established by the Company's treasurer. The officers shall provide to the Board written notice of any event which may constitute a default or an event of default under any financing, lease arrangement or any other contract or obligation of the Company immediately but in no event later than two (2) business days upon learning of such event. Furthermore, the officers shall provide to the Board written notice immediately, but in no event later than two (2) business days, upon receiving: (i) notice of a proceeding before any governmental or regulatory agency commenced by, against or that may otherwise affect the Company; (ii) notice of any threatened or actual commencement of litigation against the Company; (iii) notice from any tax authority relating to any tax claim regarding any tax returns filed or to be filed by the Company; or (iv) any other notice received from any authority that may reasonably cause any kind of material liability to the Company, to the Members, to any members of the Board or to any other representative of the Company.

3.6)   Debt. The Company and its officers or other representatives shall not, without the Board's prior written approval (which may be granted in the corresponding Annual Plan), borrow money, assume any indebtedness or assume, guarantee, endorse or otherwise become directly or indirectly liable for any debt or payment obligations exceeding thirty thousand dollars of the United States of America (US$30,000) (or its equivalent in pesos, legal currency in Mexico) in the aggregate during any fiscal year. Furthermore, any of those actions, even if under the monetary threshold referenced in this paragraph, may only be taken if they are expressly contemplated in the corresponding Annual Plan and such Annual Plan may include the consent required in this paragraph, except if such actions are under the monetary threshold referenced in this paragraph and are carried out in the Company's ordinary course of business.

3.7)   Contracts. The Company and its officers or other representatives shall not, without the Board's prior written approval (which may be granted in the corresponding Annual Plan), enter into any contract, lease, or other arrangement for the acquisition or lease of equipment or property or that otherwise creates obligations for the Company in excess of thirty thousand dollars of the United States of America (US$30,000) (or its equivalent in pesos, legal currency in Mexico) in the aggregate during any fiscal year.

3.8)   Encumbrances. The Company and its officers or other representatives shall not, without the Board's prior written approval, create, incur, assume, or cause to exist any Encumbrance on any of the Company's assets now owned or hereafter acquired.

3.9)   Dispositions. The Company and its officers or other representatives shall not, without the Board's prior written approval, sell, lease, encumber or otherwise dispose of any property, assets, rights



**11/32**

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

or business of the Company, except in the ordinary course of business and consistent with the applicable Annual Plan. Moreover, the Company and its officers or other representatives shall not, without the Members' prior written approval, dissolve, merge or consolidate the Company into or with another entity.

3.10)   Accounts. The books and records of the Company shall be maintained using Financial Reporting Standards consistently applied. The books and records of the Company will be kept and maintained at all times at the Facilities. A duplicate of the books and records staying at the Facilities will be sent to and kept at Holdings' address.

3.11)   Examination of Books and Records. Each Member will have the right at all times during usual business hours to audit, examine and make copies of or extracts from the books of account of the Company. Such right may be exercised through any agent or employee of the Member or by an independent accountant designated by such Member. Each Member will bear all expenses incurred in any examination made for such Member's account.

3.12)   Tax Returns. The president and the treasurer will cause the Company to file all tax and information returns required of the Company in a timely manner.

3.13)   Audits; Auditors. Unless otherwise mandated by the Board in writing, within the first ninety (90) days of each calendar year the treasurer will cause the financial and accounting records of the Company to be certified by a firm of certified public accountants. Copies of the audited financial report will be transmitted to the Board and the Members as soon as practicable after completion. The Company's auditors will be those selected by the Board.

3.14)   No Transactions with Related Parties. Except for the distribution of profits pursuant to the terms of this Agreement, payments related to the Loan, the Additional Loans or the Holdings Additional Loans, lease payments related to the lease of the Facilities, payments under the Engagement Agreement, and other payments authorized by the Board in writing (which may be authorized in the corresponding Annual Plan), the Company will make no payments or loans of any kind or for any reasons to any of the Members, their Affiliates, or their respective owners, directors, officers, employees, or other related parties. "Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management or business decisions of a Person whether through the ownership of voting securities, contract or otherwise.

## ARTICLE 4
## RESTRICTIONS ON TRANSFERS OF MEMBERSHIP UNITS

4.1)   Prohibitions on Disposition of Membership Units. No Membership Units of the Company now owned or hereafter acquired by a Member will be sold, assigned, encumbered, pledged, or otherwise transferred or affected, whether voluntarily or involuntarily (any such action, a "Transfer"), except (a) pursuant to the provisions of this Agreement (including Transfers effectuated pursuant to and in compliance with Sections 3.2)(d) or 4.2)) or (b) with the prior written consent of the other Member(s). Any attempted Transfer of any Membership Units made other than as permitted by this Agreement (i) will be void and produce no effects, (ii) the transferee will acquire no rights, and (iii) the Company will have no obligation to treat any alleged assignee, acquiror or pledgee as a member of the Company. The Transfer restrictions under this Section will apply to each Member for a period of five (5) years from the Effective Date (the "Non-Transfer Period"). Subject to the Members' right of first refusal under Article 66 of the LGSM, each Member will have the right to Transfer all or part of its Membership Units without any additional restriction after the expiration of the Non-Transfer Period under this sentence unless an option or other preferential right under this Agreement has been exercised, in which case the transfer of



**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

the Membership Units will remain subject to the preferential right exercised, provided, however, that the purchase price that Holdings will pay will be the greater of (1) the purchase price that TMI would have received if TMI sold its Membership Units to the independent and unaffiliated third party pursuant to this Section; or (2) the purchase price calculated pursuant to Section 4.2).

4.2)     Holdings' Option.   Commencing on the third (3rd) yearly anniversary of the Effective Date, Holdings will have the option (the "Holdings' Option") to purchase, directly or through an Affiliate, no less than one hundred percent (100%) of the Membership Units owned by TMI at the time the Holdings' Option is exercised (the "TMI's Membership Units").

If Holdings decides to exercise the Holdings' Option, Holdings will send written notice to TMI of Holdings' decision to exercise the Holdings' Option and TMI will have the obligation to sell to Holdings or its designated Affiliate no less than one hundred percent (100%) of the TMI's Membership Units, under the terms and conditions set forth in this Section 4.2).

The purchase price of the TMI's Membership Units will be equal to the fair market value of the TMI's Membership Units at the time the Holdings' Option is exercised plus a premium equal to thirty five percent (35%) of such fair market value.  Fair market value shall mean the fair market value using similar transactions of market or industry and shall be determined in good faith by one of the big four international accounting firms (E&Y, Deloitte, PWC or KPMG) selected by TMI.

The parties will negotiate a membership unit purchase agreement and ancillary documents containing terms, conditions, covenants, representations and warranties typical of purchase and sale of membership units of a private company.  Closing on the sale shall occur within ninety (90) calendar days from the date in which TMI receives the notice from Holdings exercising the Holdings' Option.  Holdings or its designated Affiliate will pay all the purchase price at the time of closing.  TMI will deliver at closing such instruments of conveyance required to vest title in Holdings or its designated Affiliate to the TMI's Membership Units.

4.3)     Tag-along Rights.   Subject to the provisions in the last paragraph of this Section 4.3), if at any time after the fifth (5th) yearly anniversary of the Effective Date any Member (the "Selling Member") proposes to sell its Membership Units of the Company to an independent and unaffiliated third party (the "Proposed Transferee"), the other Member (the "Tag-along Member") will have the right to participate in such sale (the "Tag-along Sale") on the terms and conditions set forth in this Section 4.3).  Prior to the consummation of the sale described in this paragraph the Selling Member shall deliver to the Tag-along Member a written notice (the "Sale Notice") of the proposed sale subject to this Section no later than sixty (60) calendar days prior to the execution and delivery by all the parties thereto of the definitive agreement to be entered into with respect to such Tag-along Sale.  The Sale Notice shall describe: (a) the name of the Proposed Transferee; (b) the per unit purchase price and the other material terms and conditions of the sale; (c) the proposed date, time and location of the closing of the sale; and (d) a copy of any form of agreement proposed to be executed in connection therewith.

The Tag-along Member shall provide written notice (the "Tag-along Notice") to the Selling Member and the Proposed Transferee of its decision to exercise its option under this Section 4.3) within ten (10) business days from the day of receipt of the Tag-along Notice.  If the Tag-along Member fails to deliver the Tag-along Notice within that term, the Tag-along Member will be deemed to have waived all of such Member's rights to participate in the Tag-along Sale, and the Selling Member shall be free to sell to the Proposed Transferee its Membership Units at a price that is no greater than the per unit price set forth in the Sale Notice and on other same terms and conditions which are not materially more favorable to the Selling Member than those set forth in the Sale Notice, without any further obligation to the Tag-along Member.

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

If the Tag-along Member decides to participate in the Tag-along Sale, the consideration to be received by the Tag-along Member shall be proportionally equal to the consideration to be received by the Selling Member, provided that such consideration will be proportional to the percentage of the Membership Units held by each Member at the time of the sale. The Tag-along Member shall make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Member makes or provides in connection with the Tag-along Sale.

The fees and expenses of the Selling Member incurred in connection with a sale under this Section 4.3) and for the benefit of all Members, to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by all the Members on a pro rata basis, based on the consideration received by each Member. Each Member shall take all actions as may be reasonably necessary to consummate the Tag-along Sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Member.

The Selling Member shall have ninety (90) calendar days following the date of the Sale Notice in which to consummate the Drag-along Sale, on terms not more favorable to the Selling Member than those set forth in the Sale Notice (which such ninety (90) calendar days period may be extended for a reasonable time to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Member has not completed such sale, the Selling Member may not then effect a sale of membership units subject to this Section 4.3) without again fully complying with the provisions of this Section 4.3).

In the event that TMI is the Selling Member, Holdings will have the right to exercise the Holdings' Option in lieu of participating in the Tag-along Sale. In such case, Holdings shall provide written notice to TMI of Holdings' decision to exercise the Holdings' Option within ten (10) business days from the day of receipt of the Tag-along Notice. If Holdings exercises the Holdings' Option pursuant to this paragraph, Holdings and TMI will proceed as set forth in Section 4.2) above. In the event that Holdings exercises the Holdings' Option, the Holdings' Option will take preference over the rights set forth under the prior paragraphs in this Section 4.3), provided, however, that the purchase price that Holdings will pay will be the greater of (1) the purchase price that TMI would have received if TMI sold its Membership Units to the independent and unaffiliated third party pursuant to this Section 4.3) or (2) the purchase price calculated pursuant to Section 4.2).

### ARTICLE 5
### ADDITIONAL AGREEMENTS REGARDING CAPITAL MEMBERSHIP UNITS

5.1)   <u>No Modifications to the Membership Units</u>.  The Company shall not increase or decrease its corporate capital, be recapitalized, increase or decrease the value of its Membership Units, issue additional Membership Units or other equity interests in the Company, or redeem Membership Units or other equity interests in the Company without all the Members' prior written approval.

5.2)   <u>Additional Capital</u>.   Neither party will have any obligation to make additional capital contributions beyond those set forth in Sections 2.1) and 2.2) except as agreed by all the Members in writing. If the Board determines that the Company needs additional capital, the Company and the Board will first attempt to raise such additional capital in the form set forth in Section 2.7).

The Company will only increase its corporate capital if (a) the Company and the Board are unable to secure additional capital needed in the form set forth in Section 2.7), (b) the Company's tax or financial advisors determine that such corporate capital increase is the best form to raise the necessary capital, and



73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

(c) the capital increase is approved by all the Members. The Members' meeting that approves the capital increase shall determine the terms and conditions under which such capital increase shall be subscribed and paid but observing the preferential rights under this Section 5.2). Pursuant to Article 72 of the LGSM, each Member will have a preferential right to acquire the Membership Units to be sold by the Company in proportion to their then current ownership percentages on the Company. This preferential right to purchase additional Membership Units of the Company will be exercised by delivery of written notice to the Board of the Member's decision to purchase its proportional share of the new Membership Units within fifteen (15) days following the Member's approval of the Company's equity capital increase.

## ARTICLE 6
## PROFITS AND LOSSES

6.1)     Allocation of Profits and Losses. The profits and losses of the Company will be determined by the Board each year in accordance with the accounting methods followed by the Company. All profits and losses of the Company will be allocated, both for book and tax purposes, to the Members in proportion to their respective Membership Units. Every item of income, gain, loss, deduction, credit or tax preference entering into the computation of such profits or losses, or applicable to the period during which such profits or losses were realized, will be considered allocated to each Member in the same proportion as profits and losses are allocated to such Member. The Company will maintain a capital account for each Member, which will be credited with the profits allocated to each Member according to its percentage of ownership in the Company, as well as the losses allocated to such Member.

6.2)     Distributions. The Net Operating Revenues (as defined below) of the Company will be estimated by the Board within the first sixty (60) calendar days of each calendar year. Unless the Members agree otherwise in writing, the Company will reinvest in the Business all Net Operating Revenues generated during the calendar years 2021-2024 and the Company will not make any distributions for any profits made during those years. Commencing with the year 2025 and subject to the Company establishing such reserves as the Board deems reasonably necessary to fund the business of the Company, the Members, with the Board's input, will agree on a percentage of the remaining profit to be distributed to the Members no later than April 30 of the following year, in accordance with their Membership Units.

For purposes of this Agreement, "Net Operating Revenues" means the amount by which the revenues of the Company (including all cash received in the form of operating revenues, sales revenues, revenues from notes receivable, proceeds of financing or refinancing, if any, and all other revenues from all sources) as of a given date are in excess of the amount actually spent as of a given date or estimated by the Board in good faith to be required within the next following twelve (12) months after such date (net of additional revenues anticipated to be received by the Company during such 12 month period, as estimated as aforesaid) to meet or provide for the requirements of the Company for working capital, operating expenses, development expenses, taxes, insurance, debt service for all debts and other liabilities or obligations of the Company, exclusive of any allowances for depreciation.

## ARTICLE 7
## NON-COMPETITION

7.1     TMI's Non-Compete. TMI agrees and acknowledges that TMI is familiar with the trade secrets and other information of a confidential or proprietary nature regarding the business of the Business. TMI also agrees and acknowledges that Holdings and the Company would be irreparably damaged if, after the Effective Date, TMI were to continue involved or becomes engaged in any business whose only or primary business is to manufacture, assemble, or sell new industrial trailers or new semitrailers with the same uses and the same or similar specifications to those manufactured by the Company (the "Restricted Business") anywhere in Mexico or the United States of America. Therefore, TMI agrees that (i) from and



73525752 v13

after the Effective Date and continuing for a period of ten (10) years thereafter, or (ii) from and after the date Holdings exercises its Holdings' Option or TMI sells, transfers, redeems or withdraws all its Membership Units or TMI ceases in any way to be a member of the Company, and continuing for a period of three (3) years thereafter, or (iii) until the date the Company is dissolved or liquidated, whichever occurs first (the "TMI's Restricted Period"), TMI will not, and will cause each of its Affiliates and their respective equity-holders not to, directly or indirectly, either by itself, himself, herself or through any other Person, as an owner, employee, agent, consultant, director, equity-holder, manager, co-partner or in any other individual or representative capacity, own, operate, manage, control, engage in, invest in, finance, advise, be employed by or participate in any manner in, or render services to any Person engaged in or planning to become engaged in the Restricted Business anywhere in Mexico or the United States of America.

TMI further agrees and acknowledges that (i) the covenants and agreements in this Section 7.1 were a material inducement to Holdings to enter into this Agreement and that Holdings would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the Members if TMI, any of its Affiliates or their respective equity-holders breach any of the provisions of this Section 7.1, and (ii) in order to assure Holdings that the Joint Venture, the Company and the Business will retain their value, it is necessary that each of TMI and its Affiliates and their respective equity-holders do not engage in any form, directly or indirectly, on any Restricted Business for the TMI's Restricted Period.

Notwithstanding the foregoing, (i) TMI's, its Affiliates' and their respective equity-holders' passive participation as an owner of less than five percent (5%) of the equity issued by an entity that trades in a public exchange that is engaged in a Restricted Business and (ii) TMI's, its Affiliates' and Rodrigo's participation and/or engagement in any capacity in any business or operations using exclusively or primarily the Excluded Assets (including for a Restricted Business), will not constitute a violation of the provisions in this paragraph.

7.2)     Liquidated Damages.  In the event that TMI, its Affiliates or their respective equity-holders violates any of the provisions in Section 7.1, in addition to all remedies available to Holdings, TMI agrees to pay Holdings, as fair and reasonable liquidated damages (but not as a penalty), an amount equal to five million dollars of the United States of America (U.S.$5,000,000).

7.3)     Holdings' Non-Compete.  Holdings agrees and acknowledges that Holdings is familiar with the trade secrets and other information of a confidential or proprietary nature regarding the business of the Business.  Holdings also agrees and acknowledges that TMI and the Company would be irreparably damaged if, after the Effective Date, Holdings is involved or becomes engaged in any business whose only or primary business is to manufacture, assemble, or sell new industrial trailers or new semitrailers with the same uses and the same or similar specifications to those manufactured by the Company (the "Holdings' Restricted Business") anywhere in Mexico or the United States of America.  Therefore, Holdings agrees that (i) from and after the Effective Date and continuing for a period of ten (10) years thereafter, or (ii) from and after the date Holdings sells, transfers, redeems or withdraws all its Membership Units or Holdings ceases in any way to be a member of the Company, and continuing for a period of three (3) years thereafter, or (iii) until the date Holdings exercises its Holdings' Option and acquires all the Membership Units owned by TMI, or (iv) until the date the Company is dissolved or liquidated, whichever occurs first (the "Holdings' Restricted Period"), Holdings will not, and will cause each of its Affiliates and their respective equity-holders not to, directly or indirectly, either by itself or through any other Person, as an owner, employee, agent, consultant, director, equity-holder, manager, co-partner or in any other individual or representative capacity, own, operate, manage, control, engage in, invest in, finance, advise, be employed by or participate in any manner in, or render services to any Person engaged in or planning to become engaged in the Holdings Restricted Business anywhere in Mexico or in the United States of America.



**16/32**

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Holdings further agrees and acknowledges that (i) the covenants and agreements in this Section 7.3 were a material inducement to TMI to enter into this Agreement and that TMI would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the Members if Holdings or any of its Affiliates or their respective equity-holders breach any of the provisions of this Section 7.3, and (ii) in order to assure TMI that the Joint Venture, the Company and the Business will retain their value, it is necessary that each of Holdings and its Affiliates and their respective equity-holders do not engage in any form, directly or indirectly, on any Holdings' Restricted Business for the Holdings' Restricted Period.

Notwithstanding the foregoing, Holdings' and its Affiliates' and their respective equity-holders' passive participation as an owner of less than five percent (5%) of the equity issued by an entity that trades in a public exchange that is engaged in a Restricted Business will not constitute a violation of the provisions in this paragraph.

7.4)     Liquidated Damages.  In the event that Holdings or its Affiliates or their respective equity-holders violates any of the provisions in Section 7.3, in addition to all remedies available to TMI, Holdings agrees to pay TMI, as fair and reasonable liquidated damages (but not as a penalty), an amount equal to five million dollars of the United States of America (U.S.$5,000,000).

## ARTICLE 8
## INDEMNITY OBLIGATIONS

8.1     TMI's General Obligation to Indemnify.  In addition to any other right or remedy available to Holdings or the Company, TMI will indemnify, defend and hold harmless Holdings and the Company against and from, and pay on behalf of or reimburse them as and when incurred for, any Adverse Consequences (as defined below), which they may suffer, sustain or become subject to as the result of, arising out of, relating to or caused by the breach by TMI of any provisions in this Agreement, except for the breach of any provisions that do not result in a Material Adverse Effect.  For purposes of this paragraph, "Adverse Consequences" means, with respect to any Person, any damages, liability, debt, obligation, deficiency, interest, tax, penalty, fine, claim, demand, suit, proceeding, judgment, cause of action or other loss, cost or expense of any kind or nature whatsoever, including all documented amounts paid or incurred in connection with any action, demand, proceeding, investigation or claim by any third party or governmental entity against or affecting Holdings or the Company. In no event shall TMI be liable to Holdings, the Company or to any third party for any unasserted, contingent, indirect, punitive, incidental, special, lost profit or consequential damages (including but not limited to such damages arising from breach of contract or warranty or from negligence or strict liability), in connection with this Agreement, even if TMI has been advised of the possibility of such damages and regardless of the legal or equitable theory (contract, tort or otherwise) upon which the claim is based.

8.2     Holdings' General Obligation to Indemnify.  In addition to any other right or remedy available to TMI or the Company, Holdings will indemnify, defend and hold harmless TMI and the Company against and from, and pay on behalf of or reimburse them as and when incurred for, any Adverse Consequences (as defined below) against or affecting TMI or the Company, which they may suffer, sustain or become subject to as the result of, arising out of, relating to or caused by the breach by Holdings of any provisions in this Agreement, except for the breach of any provisions that do not result in a Material Adverse Effect. For purposes of this paragraph, "Adverse Consequences" means, with respect to any Person, any damages, liability, debt, obligation, deficiency, interest, tax, penalty, fine, claim, demand, suit, proceeding, judgment, cause of action or other loss, cost or expense of any kind or nature whatsoever, including all documented amounts paid or incurred in connection with any action, demand, proceeding, investigation or claim by any third party or governmental entity against or affecting TMI or the Company. In no event shall Holdings be liable to TMI, the Company or to any third party for any unasserted,



73525752 v13

Imported, Signed and Shared by OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

contingent, indirect, punitive, incidental, special, lost profit or consequential damages (including but not limited to such damages arising from breach of contract or warranty or from negligence or strict liability), in connection with this Agreement, even if Holdings has been advised of the possibility of such damages and regardless of the legal or equitable theory (contract, tort or otherwise) upon which the claim is based.

## ARTICLE 9
## DISSOLUTION AND LIQUIDATION

9.1)    Dissolution.  The Company will be dissolved upon the occurrence of any event provided in article 229 of the LGSM that would cause the termination or dissolution of the Company.  The Company's dissolution must be approved by all Members according to Section 3.2)(c).

9.2)    Liquidation.  Upon dissolution of the Company, it will be liquidated following the process stated in its Bylaws and this Agreement and applying its assets in the following order of priority:

(a)     First, to pay all debts and other liabilities of the Company, including loans made by the Members and third party lenders.  If any liability is contingent or uncertain in amount, a reserve equal to the maximum amount to which the Company could be reasonably held liable will be established.  Upon the satisfaction or other discharge of such contingency, the amount of the reserve not required, if any, for such satisfaction or discharge will be distributed in accordance with the following paragraphs.

(b)     Second, to pay any other amounts owed by the Company to any Member for anything other than capital contributions.

(c)     Third, to pay the capital contributions of the Members to the Company.

(d)     Fourth, any remaining amounts will be distributed among the Members in proportion to their ownership participation on the Company at the time the dissolution is commenced.

## ARTICLE 10
## GENERAL PROVISIONS

10.1)   Termination.  This Agreement may only terminate upon the occurrence of: (a) the written agreement of the Company and all of the Members who then own Membership Units or (b) the total dissolution and liquidation of the Company.

10.2)   Amendment.  This Agreement may be amended at any time only by written instrument executed by the Company and all of the Members who then own Membership Units.

10.3)   Notices.  All notices required or permitted by this Agreement will be in writing and will be sent by overnight delivery by a reputable commercial courier such as FedEx, UPS or DHL or by personal delivery, to or at the following addresses:

To Company:

        Inland Trailer, S. de R.L. de C.V.
        Privada Del Marques No. 2
        Col. Parque Industrial El Marques
        El Marques, Querétaro, México C.P. 76246
        Attn:  Rodrigo Soto Pesquera



73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

And

Inland Trailer, S. de R.L. de C.V.
c/o Inland Trailer Holdings, LLC
12225 Stephens Rd
Warren, Michigan, USA  48089-2010
Attn: Kyle E. Blain

To TMI:

TMI Trailer Mechanic International, S.A. de C.V.
Privada Del Marques No. 2
Col. Parque Industrial El Marques
El Marques, Querétaro, México C.P. 76246
Attn:  Rodrigo Soto Pesquera

To Holdings:

Inland Trailer Holdings, LLC
12225 Stephens Rd
Warren, Michigan, USA  48089-2010
Attn:  Kyle E. Blain

With a copy to (which will not constitute notice to Holdings):

Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota, USA  55402-1425
Attn:  Luis G. Reséndiz

or at such other address as the party to whom the notice is addressed provided hereafter by written notice to the other parties. Each party may change its address to receive notices by providing written notice to the other parties as provided in this Section at least ten (10) calendar days prior to the effective date of the change.  All periods of notice shall be measured from the date of delivery thereof if personally delivered or from the first business day after the date of sending if sent by overnight courier.

If a Member fails to notify the other parties of such Member's address for the purposes of notice under this Agreement, such Member's address as reflected on the books or records of the Company will be such Member's address for the purposes of this Section.  Upon the request of any Member, the Company will provide such Member with the address of the other Members as reflected on the Company's books or records.

10.4)  <u>Scope</u>.  This Agreement will be binding upon and be enforceable by the parties and their respective permitted successors and assigns, who are obligated to take any action which may be necessary or proper to carry out the purposes and intent of this Agreement.

10.5)  <u>Remedies; Recovery of Expenses</u>.  In addition to and not in limitation of any and all remedies provided for in this Agreement and those other remedies that are available to the parties under applicable law, all of which will be cumulative, if a Member fails to consummate any of the transactions contemplated by this Agreement for any reason or otherwise breaches any provisions under this Agreement, the other Member and the Company will have the right to seek and to have the specific



19/32

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

performance of this Agreement. In the event of a dispute concerning the enforcement or interpretation of this Agreement, the prevailing party with respect to such dispute, whether by mediation, arbitration, legal proceedings or otherwise, will be entitled to recover and will be reimbursed immediately by the non-prevailing party(ies) for the reasonable attorneys' fees and other reasonable and documented costs and expenses incurred by the prevailing party.

10.6)   Enforcement. If any provision of this Agreement is determined by a final judgment to be unlawful or unenforceable in whole or in part, such provision shall be given force to the fullest extent provided by law and the remainder of this Agreement shall be construed as if the illegal or unenforceable portion was not contained herein and this Agreement shall otherwise remain and continue in full force and effect. Further, if any provision in this Agreement is held to be overbroad as written, such provision shall be deemed amended to narrow its application to the extent necessary to make the provision enforceable according to applicable law and enforced as amended.

10.7)   Definitions. In addition to the terms already defined in this Agreement, the following terms have the definitions set forth below:

(i)      "Material Adverse Effect" means with respect to the Assets or the Business, an effect (a) that is materially adverse to all or substantial part of all the Assets or (b) that materially and adversely affects the financial condition of the Company or the continuation of the Business taken as a whole, provided, however, that any defaults, breaches, violations, disputes, non-compliance, complaints, indebtedness or other liabilities or obligations resulting in cumulative losses, damages or liabilities to the Company in excess of U.S.$50,000 (fifty thousand dollars of the United States of America) will be considered to have a Material Adverse Effect. Therefore, all cumulative losses, damages or liabilities above U.S.$50,000 (fifty thousand dollars of the United States of America) will be considered to have a Material Adverse Effect, in the understating that the Members' indemnity obligations, and the corresponding recovery rights of the non-breaching party, will only apply to the Adverse Consequences exceeding the U.S.$50,000 (fifty thousand dollars of the United States of America) threshold mentioned above.

(ii)     "To its knowledge" means (i) with respect to TMI, the actual knowledge of Rodrigo or the knowledge Rodrigo would have after due inquiry of those persons having responsibility for the matters in question; and (ii) with respect to Holdings, the actual knowledge of Kyle Edward Blain or the knowledge Kyle Edward Blain would have after due inquiry of those persons having responsibility for the matters in question .

(b) The definitions set forth in this Agreement shall apply equally to both the singular and plural forms of such terms. Whenever the context may so require, any pronoun shall include the corresponding masculine, feminine and neutral forms. Unless the context shall otherwise require, all references to clauses and sections and to paragraphs, items or numerals of clauses or sections, shall be deemed to be references to clauses, sections, paragraphs, items or numerals of this Agreement, and all references to Exhibits and Schedules shall be deemed to be references to Exhibits and Schedules of this Agreement, which are hereby incorporated by reference to be a part of this Agreement. The words (i) "hereof", "herein" "hereunder", "in this Agreement", "this Agreement" "hereinafter" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular clause, section, paragraph, item, or numeral of this Agreement; and (ii) "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", unless such phrase otherwise appears.

(c) In addition, references to (i) any agreement, contract, document, or instrument includes the reference to such agreement, contract, document, or instrument as amended, amended, and restated,



73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

supplemented, or otherwise modified from time to time, and (ii) any law, rule or regulation includes the amendments thereto from time to time or to any law, rule, or regulation successor thereto.

(d) This Agreement is subject to the terms of the JV Agreement, and in the event of inconsistency between this Agreement and the terms of the JV Agreement, the terms of the JV Agreement shall prevail.

10.8)   Venue; Governing Law.   The parties agree that the jurisdiction and venue for any dispute related to this Agreement will be the U.S. Federal District Court for the Eastern District of Michigan, USA or the State courts located in Macomb County, Michigan, USA. Said courts shall have exclusive jurisdiction over the litigation, and the parties agree to submit themselves to the exclusive jurisdiction of the court chosen by plaintiff, and agree not to initiate any litigation anywhere other than in such court. The parties expressly waive any right to any other jurisdiction or venue that may apply to them by virtue of their current or future domiciles or for any other cause or reason. The parties agree that the laws of the State of Michigan, USA will govern the interpretation, compliance and enforcement of this Agreement, without regard to any conflicts of law principles, except that (a) the LGSM will also apply and (b) in the event of a conflict between the provisions in the LGSM and the provisions in the he laws of the State of Michigan, USA, the provision in the LGSM will prevail.

10.9)   Entire Agreement.   This Agreement constitutes the entire agreement among the Members and the Company with respect to the subject matter hereof and supersedes any and all prior understandings or representations by or among the Members (or their Affiliates or their respective representatives) and/or the Company, written or oral, to the extent related in any way to the subject matter hereof.

The Members and the Company have executed this Agreement to be effective commencing on the day and year first above written.

TMI Trailer Mechanic International, S.A. de C.V.

By: _____
Name:  Rodrigo Soto Pesquera
Its:  Sole Director

Inland Trailer Holdings, LLC

Por / By: _____
Name:  Kyle Edward Blain
Its:  President

Inland Trailer, S. de R.L. de C.V.

By: _____
Name:  Rodrigo Soto Pesquera
Its:  Manager and Legal Representative

By: _____
Name:  Kyle Edward Blain
Its:  Manager and Legal Representative

**21/32**

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit A

**Infrastructure Contributed by TMI**



73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit B

**Machinery and Equipment Contributed by TMI**

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit C

**Raw Materials, Inventory and Work in Process Contributed by TMI**

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit D

**Intellectual Property and Proprietary Rights Contributed by TMI**

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit E

**Permits, Approvals, Registrations, Licenses, Certifications and other Authorizations Contributed by TMI**

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit F

**Agreements and Commitments Contributed by TMI**

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit G

**Other Miscellaneous Assets Contributed by TMI**



28/32

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit H

**Excluded Assets**

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit I

**First Annual Plan**



**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Exhibit J

**Engagement Agreement**

73525752 v13

**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

Schedule 2.4(a)

**Excepted Indebtedness and Liabilities**



**Imported, Signed and Shared by** OP.Sign

Last update: 17 Nov 2021, by Rodrigo Soto

## FIRST AMENDMENT TO MEMBER AGREEMENT

This First Amendment to Member Agreement (this "First Amendment") is made effective as of March 1, 2022 (the "Effective Date"), by and among Inland Trailer, S. de R.L. de C.V. (the "Company"), Inland Trailer Holdings, LLC in its capacity as member of the Company ("Holdings"), and TMI Trailer Mechanic International, S.A. de C.V. in its capacity as member of the Company ("TMI"). Holdings and TMI will be individually referred to as a "Member" and collectively as the "Members".

### RECITALS

A. The parties entered into a Member Agreement (the "Member Agreement") whereby, among other things, the Members agreed to make certain Initial Contributions to the Company.

B. The parties want to amend the Member Agreement to (i) modify the amount of the Initial Contributions; and (ii) modify other applicable provisions of the Member Agreement.

### AGREEMENT

1.      Capitalized terms used but not defined herein will have the meaning given to them in the Member Agreement.

2.      The parties acknowledge and agree that the Effective Date of the Member Agreement will be March 1, 2022.

3.      The first sentence of the second paragraph of Section 2.2)(a) of the Member Agreement is hereby amended in its entirety to read as follows:

> "The parties agree that for purposes of determining and computing the amount of TMI's contribution, the total value of the Assets will be assessed at US$409,947.37 (four hundred nine thousand nine hundred forty seven 37/100 dollars of the United States of America)."

4.      The caption and the first sentence of Section 2.2)(b) of the Member Agreement are hereby amended in their entirety to read as follows:

> "(b)    *Holdings' Initial Contributions*. On the Effective Date Holdings will contribute and pay to the Company, in cash, US$426,679.93 (four hundred twenty six thousand six hundred seventy nine 93/100 dollars of the United States of America)."

5.      The parties expressly acknowledge and agree that (i) for purposes of complying with Mexican law, their Initial Contributions were calculated in Mexican pesos on the Effective Date and the Initial Contributions in Mexican pesos come out to represent exactly fifty one percent (51%) of the total Initial Contributions being subscribed and paid by Holdings and forty nine percent (49%) of the total Initial Contributions being subscribed and paid by TMI; and (ii) even though mathematically the amounts of the Initial Contributions in U.S. dollars do not amount to the exact same split due to exchange rates, for all intents and purposes Holdings' Initial Contributions will be deemed equal to exactly fifty one percent (51%) of the total Initial Contributions and TMI's Initial Contributions will be deemed equal to exactly forty nine percent (49%) of the total Initial Contributions.

6.      The second sentence of Recital E of the Member Agreement is hereby amended in its entirety to read as follows:




"For such purposes, the parties have agreed that commencing on the Effective Date the Company will operate the Business and that all the assets, properties and rights currently used in, owned by, or related to the Business (hereinafter, the "Assets") be transferred and contributed to the Company, regardless of whether the Assets are within the Facilities or elsewhere and whether owned by TMI or third parties, except for (i) the Excluded Assets (as defined below); and (ii) such other Assets which on or prior to the Effective Date have already been transferred by TMI or any third party to the Company or Inland Trailer Land, S. de R.L. de C.V."

7.      This First Amendment does not novate the Member Agreement.  All provisions in the Member Agreement will continue in full force except as expressly modified in this First Amendment.  In the event of any conflicts between this First Amendment and the Member Agreement, the provisions in this First Amendment will prevail.

        Having read this First Amendment and with full knowledge of its legal effects, the parties execute it to be effective as of the Effective Date.

TMI Trailer Mechanic International, S.A. de C.V.

By: _____
Name:  Rodrigo Soto Pesquera
Its:  Sole Manager and Legal Representative

Inland Trailer Holdings, LLC

By: _____
Name:  Kyle Edward Blain
Its:  President

Inland Trailer, S. de R.L. de C.V.

By: _____
Name:  Rodrigo Soto Pesquera
Its:  Manager and Legal Representative

By: _____
Name:  Kyle Edward Blain
Its:  Manager and Legal Representative